Ms. Gaines for the appellant, Mr. Tafe for the appellee. Good morning, your honors. Good morning. May it please the court, my name is Eden Brown Gaines and I have the distinct honor of representing Ora Tabron. I would like to reserve two minutes for rebuttal time. Ms. Tabron is a highly intelligent, extremely competent, infinitely professional woman who has given decades of her life to the civil service of this country. Despite a long list of accomplishments, accolades, and indisputable competencies and qualifications, white executives at the Customs and Border Protection Office denied Ms. Tabron a promotion to a seat at the executive table because she is a dark-skinned, African-American woman. I'm certain that this court has familiarized itself with the record and asked permission to dispense with a recitation of the facts. You can, yes. I don't understand the reference to dark skin. Nothing in the case, none of the facts I saw had anything to do with dark skin versus light skin. Well, one of the claims in the complaint was discrimination based on color, which admittedly is not often brought before the courts these days. But part of the issue is not just that she's African-American, but a person of darker skin or darker complexion. Ladies, I mean, gentlemen, on this record, I cannot help but suggest that something other than basic application of the facts to the law occurred in this case. I don't know if the decision is based on what we have seen as a backlash against the civil rights laws in the last few years in our jurisprudence, or whether the decision is the outcome of an overtaxed court who must pick and choose among the controversies to which it has time to give thorough exposition, or whether the word of the U.S. Attorney's Office is taken, even if demonstrably unreliable, over the ordinary citizen, or whether there was some other factor that led to us being here today. I simply know that it was not justice. I'm not going to argue that the court attempts to even determine why the opinion of the district court is so divergent from the law and the credible record facts. Instead, I'm going to ask for the court's assistance in maintaining the integrity of this judicial system. The American people are losing faith in our judicial system, and I think the gap between our country and countries like Egypt or Brazil, where civil unrest has become the rule of the day, is becoming increasingly narrow. There are few who will openly disagree with the concept that distinguishing factors in the selection process should not include race and skin color. You – let me just interrupt you and ask you about an aspect of the record that at least I think is pretty important. You give four examples of evidence of racial animus here, having to do with Wallace, Gaither's family, Manley, Scott, and Bannister. Those four cases. Which do you think is your strongest – which one of those do you think is the strongest evidence of racial animus on the part of the higher official? Well, I think with respect to the discriminatory animus, I think the largest example is the case of Sharon Brown. Ms. Brown was also a dark-skinned applicant. Is she the one who – she's the other applicant for whom there was no request for transcript? Is that the point? That's right, Your Honor. Just weeks after this non-selection, Sharon Brown applied for a position. She submitted her graduate transcript because the requisite education to qualify the job – for the job was contained in her graduate transcript. She assumed that the Human Resources Office would know that having attended graduate school, she also attended undergraduate school. And she had submitted her undergraduate transcript in a prior application. And in order to have the job, she then encumbered. When she realized that she had been found ineligible because of this issue with the undergraduate transcript, she contacted the hiring center. The same hiring – So as to that one, is there evidence in the record from which we could conclude – that a regional jury can conclude that Coval was involved in that? Absolutely. It was the same hiring center that works closely with the office. Coval was the selecting official in that case as well. When she contacted the hiring center, the hiring center, if they wanted to treat everyone the same, could have just as easily have gone to Ms. Coval, said, we're going to allow in this case individuals to submit transcripts so that they can be found eligible for selection. So it was the hiring center rather than Ms. Coval? Yes, that's correct. That's correct. Yes, I mean, there was a distinction in the sense that in Ms. Tabron's case, the selectee went directly to the selection officials, which is prohibited. You're not supposed to talk to the selection officials once the announcement has closed. The government says in its brief that there was no – there's no evidence in the record that Coval was even alerted to the problem of the transcript in the Brown case. Is that not accurate? I'm sorry, Your Honor. The government says there's no evidence that Coval was alerted to the transcript omission in the Brown case. That's correct. There's no evidence. Ms. Coval didn't say, I knew that Sharon Brown had applied and had been found ineligible. That's correct. But Ms. Brown did go to the hiring center, the same hiring center that Ms. Coval went to. And the hiring center in Ms. Reyes, the selectee's case and the issue that we're here today for made the change. Didn't the hiring center resist the change in this case? They exactly resisted it because it was – So the – so the hiring center, its position in both cases, at least in principle, was the same. Don't mess with the process. Right? Initially, yes. And it was Coval who overruled it in this case. That's – well, she didn't overrule it. The hiring center has the ultimate authority decision. So they decided in that case – They decided it under pressure from her, right? Yes. That's correct. She's – So then the government's point that she wasn't alerted to the transcript problem in the Brown case is significant, isn't it? I don't think so. I don't think it's distinguishing such that it doesn't lend as evidence from which a fact finder could draw certain conclusions. If you take the light and the evidence in the light most favorable to Ms. Tabron, as the court was to do on summary judgment, and consider all reasonable inferences therefrom, the fact that you have the hiring center in one case saying yes and in another case saying no suggests discrimination, and a jury could certainly draw that inference. The fact that they may see it another way doesn't mean that summary judgment was appropriate. And I think as – with that as a factor of discrimination, coupled with what the law says about manipulating the selection procedures, which is very much what happened in this case, coupled with other – I want to go back to the question that Judge Tatel asked you at the outset. What is your evidence of animus? And also, can you deal with the point the government makes that Ms. Covell, after all, had recommended your client for promotion before? Certainly. You did say in your brief that she was under pressure from somebody senior, but I don't see any indication of that in the evidence. Yes, there's a genuine issue there. Ms. Tabron – Well, I think there's a little confusion on what it means to make a conclusory allegation. A conclusory allegation isn't conclusory simply because it was offered by the plaintiff. A plaintiff is able to testify, and that's real evidence. Allegations are conclusory when you use general terms. For example, I was discriminated against. I was retaliated against. That's conclusory. But to say this is what happened and here are the details, that isn't conclusory. So when Ms. Tabron said in her affidavit that Ms. Covell was forced to promote me by the assistant commissioner, Debbie Spiro, at the time, that counts as evidence. No, no, no. That's an allegation. That's an allegation. And the only evidence is contrary. You have no evidence to support that. Well, she gave a statement. Who? Ms. Tabron. How could she know? Because she was there. She had first-hand knowledge. Of what? Of the fact that Ms. Covell had to be forced by Debbie Spiro, the assistant commissioner. She was part of the conversation. She talked. She was part of the conversation. Yes, sir. She worked with all of them at the time. No, I'm asking you, she was part of the conversation between the assistant commissioner and Covell? No, she's not saying that she was a part of the conversation between the two of them. Then she has no evidence of this, right? Well, if Debbie Spiro talks to her and tells her. Wait a minute, wait a minute, wait a minute. Do you have any? I don't see any allegation of that. Your Honor, there's simply an affidavit that just says a statement. And I believe Ms. Tabron also testified to it in her deposition. But I've looked at it carefully. I don't see any support for that contention. Now, there's another thing on evidence. You can't rely on hearsay statements because they wouldn't be admissible in response to a summary judgment motion. Well, you can rely on hearsay if it could be admissible at court. Right. And if it's. Now, with respect to the question Judge Tatel asked you about the four incidents, they're all hearsay, are they not? You're relying on hearsay. No, sir. Ms. Tabron has firsthand knowledge of many of the incidents. For example, she gave as an example of discriminatory animus the fact that Ms. Kobel would come in in the mornings and not speak to her or the other African-American staff members. She was there. It's firsthand knowledge. She observed Ms. Kobel's relationships with other African-American supporters, I mean subordinates, because she worked closely in the office with Ms. Kobel. So the only evidence that she asserts is that Ms. Kobel was cold vis-a-vis when she walked in in the morning. Not to everyone. She spoke openly to the people who were not African-American in the office, but she was cold to the African-Americans in the office. She gave evidence. There was no support from anybody else, from any other African-American to that effect. No, except for Ms. Brown, who feels like that she, too, was discriminated against. But, again, a conclusory statement is just, I've been discriminated against. A statement that gives us this. Can I ask a question about that? Sure. So we have a case called Green v. Dalton, which I think was referenced in the briefing. You can correct me if I'm wrong about that. But in that, the issue came up about whether an allegation was conclusory. And the statement in the affidavit was a retaliation claim. And the statement of the affidavit, by the person who allegedly was retaliated against, was that she had applied for summer jobs in two prior years and was not hired, even though another student who had less experience in education was hired. And so that's more than a bare allegation of discrimination. It says what the facts were that support it, which is to say that there was another student who is a comparator because they had less education and experience, but they were hired. I wasn't, and there must have been retaliation as a consequence, which is the inference that Green urged to be drawn. But we held that that was still too conclusory. Because I think that statement doesn't drill down far enough. And I think there's a distinction between that statement and what we have here. She's just not saying that I didn't get selected for this job and my qualifications were superior. She's giving specific examples. She's saying I had eight years in headquarters setting the policy and the agenda for CBP, and the selectee didn't even have a single year. I had been auditing. Oh, I'm sorry. I was talking about the, not the overall allegations of her qualifications vis-a-vis RAFs, but about the specific four allegations in the. But she also gave specific allegations of discrimination. To say that someone comes into the office and doesn't speak to the African Americans in the office, but speaks to the white individuals in the office, is more than just saying this person acts discriminatory or has bias against me. It drills down and provides specific facts. To give the names of subordinates who worked for the decision maker, and to give examples of how that decision maker mistreated the African American subordinates in comparison to other than, mostly white in this case, but in other cases other than African American subordinates, and then to say when they went to other supervisors how their careers dramatically changed, that's a little more than the broad conclusory allegation. It's drilling down and giving specific facts. So if we were to say that we're leaning towards saying that just because a plaintiff says it, just because a plaintiff offers their testimony, it's conclusory, and I'm certain that that is not what this court intends to do. The court wants specifics. The court wants the parties to drill down and not make the bald allegations, but we don't want to go so far as to say we're not listening to anything the plaintiff says. Juries have the right to hear testimony from the plaintiff and to make assertions, to draw inferences, and to make determinations based on what the plaintiff has offered. I think my time is up. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Damon Tate, and I represent the United States. And it's the view of the government in this case that the district court properly granted summary judgment on the record before it. Listening to the court's questions, I believe the court is thinking about this in a way that makes sense. But stepping back, we would point out one large fact here that has not gone addressed, which is that all of the discussion so far, and indeed the emphasis of the plaintiff's brief on appeal, is actions that Cavell took. And we're more than willing to defend all of those actions. We think they're the actions of a good government servant doing the right thing. But in this case, it's important to note that Cavell was not the selecting official. The selecting official was Daniel Baldwin. He gave a declaration that's gone completely unrebutted in this case as to what he looked at in making this decision. And he said he looked at three things. He looked at the resumes that were submitted for Ms. Tabren and Ms. Reyes, the interview notes, and the interviews were conducted by James Madden and Keith Richard, that is to say, not Ms. Cavell, and then Ms. Cavell's recommendation that he agreed with. And if you look at Mr. Baldwin's declaration, he says in three different places on two pages that field experience made all the difference to him, that Reyes had it, and specifically that Ms. Tabren did not have it, at least of the level that Reyes did, and not in the boots-on-the-ground sense that he considered to be the most valuable. And that's why he made his decision. So that's definitely possible. But I guess the question is if Cavell's recommendation is part of the decision-making process, and so let's just hypothesize, for the sake of argument, I don't know if we'll resist it, understandably, but let's just hypothesize that her recommendation is born of some illicit consideration. If that's true, and that's part of the recommendation process, and it was conceivably taken into account, well, then that's something that goes to a jury. No? If it was based on an illicit factor that he then took without making his own independent determination, I think that that might be a concern. No, no, no, no. If the evidence was over, if there was clear evidence of Cavell's racial animus, and she recommended based in part on racial animus, then the case is quite different, isn't it? I agree the case would be certainly different than the one we have here. So you still have to defend Cavell's position. There's no way to avoid it. Absolutely, I'm willing to defend Ms. Cavell's position. As long as you best look to it. Yes, Your Honor. In the view of the government, Ms. Cavell's actions here are indistinguishable from someone who is trying to ensure the broadest and best qualified applicant pool that she had. What about the point that I asked counsel about, that Ms. Cavell had recommended the plaintiff for promotion before, which is usually regarded as a powerful evidence against a discriminatory animus. Her response is that the allegation is that Cavell was pressured to do that. Well, there's no evidence in the record that that's the case, Your Honor, aside from a conclusory statement in a declaration by the plaintiff that she believes it to be true. And notably, getting to Your Honor's question, there's not even an allegation that she was privy to the conversations between Cavell and Sparrow on that point. So in the view of the government, it's pure speculation, which isn't sufficient on summary judgment. But moving on to the remainder of the evidence with respect to Cavell. Isn't there pretty powerful evidence, at least, about preselection here? We believe that there's some evidence. We would disagree with the characterization that it's powerful. This fellow at Bosinger, is that his name? Bosinger. Bosinger. Yes. He says at Joint Appendix 296, he said, he said, the applicants I rated as ineligible happen to be the ones the management wanted to select. That's in his e-mail. It is. Our response to that, Your Honor, is that there's no description of what the source of his knowledge might be. It sounds, in the government's view, like the words of somebody who is being made to do extra work that he didn't know how to do, know he didn't believe he needed to do. Wait a minute. The applicants I rated as ineligible, is that false? It's not false. It's correct. Okay. And did the ones he rated as ineligible, were those the two management wanted? Was that the one who was selected? Taborn, yes. I included her. Okay. So I don't understand what's wrong with this statement. It seems to be pretty clear evidence. I mean, I understand your argument that preselection by itself isn't sufficient. But, I mean, I've seen a lot of cases here, and I haven't seen evidence quite like that on preselection. That's pretty clear. Your Honor, there's no evidence about what the source of his knowledge is. There's no evidence in that e-mail. There's no description of, I talked to Cavell, I talked to Baldwin. He says he rated them. Yes. To be clear, he's the one who rated them ineligible. And then there was a decision by HR after urging by Cavell to reopen the process. We're just at summary judgment here. You may be able to prove that this isn't, but how could a jury not conclude from that that there's preselection? Because there's no evidence as to – Can I ask you the question this way? Suppose that the law prohibited preselection. I mean, the law prohibits discrimination. You could make the argument that the law doesn't prohibit preselection. It prohibits preselection with a discriminatory bias. But let's just assume there's a statute that bars preselection. Would you take the position as the government that the law against preselection, hypothesizing that law to be in effect, that this case couldn't go to a jury on whether there was preselection? It would be a closer call than what we have today. I would still feel comfortable defending the idea emerging here, which is that one statement untethered from any context as to the source of his knowledge or whether it's pure speculation would not be enough to overcome the statements of the selecting official and the recommending official. But certainly that's a closer call than the ultimate question here, which Your Honor alluded to, which is that even putting preselection to one side, that doesn't overcome the problem that Your Honor noted in the Green case, which is that preselection itself is tenuous evidence at best of impermissible pretext or discrimination. So our position in this case is that we would not conclude that there is sufficient evidence of preselection to go to a jury here. But if the Court disagrees with us, then that's... So let's go on to the evidence of animus. Here's what she says about Darlene Bannister. She says, there is disparity in how she is treated compared to the Caucasian staff. Covel assigns more challenging work to the other staff assistants and assigns only routine, non-challenging work to Darlene. We would question why Ms. Bannister, if I have her name correct, didn't submit a declaration of that. She would be the best evidence of that. We have a responding declaration that Ms. Covel provided explaining that that's, in fact, not a fair characterization. Isn't your response that that's conclusory under Green unless there's any support? Yes, Your Honor, that's correct. I think it would be a rare case in which a plaintiff alleging discrimination could not concoct or at least describe some alleged facts relating to other people that would suggest that he or she is not alone in experiencing what he or she alleged that she experienced. But it would, if that were enough to overcome summary judgment, it would be a rare case in which summary judgment is appropriate. And as Your Honor suggested, the answer here is that the only evidence is her own broad statements about what happened. I think this might be a different case if we had declarations from all of these people that suggested that there were some veracity to the allegations. But what if it was her and she gave allegations, but they're just much more specific and detailed about exactly which incidents she's talking about? It's still in the same vein that it has to do with disparate treatment, and one was treated more harshly than another, but it's at a lower level of generality. I think that would help their case, Your Honor, but we would then have to go into a much more detailed analysis about were these people similarly situated? Did they have knowledge? I mean, what were the backstories as to what happened here? And the evidence is just woefully underdeveloped on this record. Even if we were to have more detailed declarations, I think that would be a tougher case. But without knowing what the details are, such that we would have a chance to submit responding declarations or take depositions, it's difficult to offer a much more specific response. What about her one statement made in oral argument here to the effect that she observed that Corral, when she came in the morning, was more friendly to whites than she was to blacks? Well, that statement is admissible, but in terms of its probative value, it's very, very small, especially in light of the same actor presumption here, which is in the past, Ms. Cavell sponsored, in effect, Ms. Tabren for promotion. And she testified in a declaration that since that happened, in the intervening years, working with her, it's become increasingly difficult. And that makes sense as an explanation for how we got to this point. Doesn't that also support the preselection? How so, Your Honor? Doesn't that also support the preselection? I don't believe it does, Your Honor. I mean, she didn't like Ms. Tabren. Well, she experienced difficulties working with her, but at the same time, Your Honor, Ms. Tabren was one of the two finalists selected from about 16 for this position. It doesn't matter. If the case was a preselection case, it would be strong. But on the other hand, perhaps I'm naive, but I can't imagine any situation in which a supervisor has two subordinates working for him or her who wouldn't have a preference of one over the other, without regard to race, if a job came up. I mean, human nature being what it is. That's absolutely right, Your Honor. It's why preselection itself is not illegal. And this Court has issued decisions stating that it's not even uncommon or terribly progrative of illegality. And at the very most, as the Court said, that's what we have here. The evidence of racial animus is vanishingly thin. Well, preselection would be more of a problem if, it seems, if the person who made the preselection hadn't worked directly with the two applicants. Then it would be more problematic. But if the supervisor making the recommendation has two people who are direct reports, it's inconceivable that such a supervisor wouldn't have a preference, without regard to race. Anyway, that just seems like perhaps I'm relying on human nature rather than law. We agree, certainly, Your Honor. And that's why it's the view of the government that allowing preselection itself to carry the day in a case like this would render it very, very difficult for innumerable business circumstances involving management, where as soon as you know one of the two applicants and you like that applicant and think that applicant is a promising candidate, if that evidence alone could support legal discrimination. Well, can I ask one follow-up question to Judge Silberman's question to you, which is that the suggestion that there was an observation that Covell was colder to certain employees than other employees, one rather than the other, is that a gloss on the statement in Taboron's affidavit, or is that coming from somewhere else? In fact, in other words, was there actual testimony, a deposition testimony or something like that that says that, or is that a description? As far as I'm aware, it's flowing from the gloss on the affidavit. Okay. I'm not aware of any deposition testimony to that effect. Okay. Anything else? Thank you, Your Honor. Thank you. I think Ms. Gaines was out of time. You can take one minute if you'd like it. Thank you, Your Honor. Yeah. Just a couple of quick points. Okay. With respect to the idea that Ms. Covell had promoted Ms. Taboron in the past, I just want to make the point that that could be evidence that a jury could consider against Ms. Taboron, but it's evidence that has to go to a jury. It's not per se dispositive of whether summary judgment was appropriate. And then let me point out that there are glass ceilings. There are what? Glass ceilings. You can promote someone to a certain point because you need them to do the work and you need good people to work. But then when it comes to sitting at a seat with management next to you, you may be against that because of your racial bias and discriminatory animus. I'd also like to point out that this isn't just a preselection case. It's preselection plus manipulation of the selection procedures plus discriminatory animus plus a decision maker who was not credible in the testimony that she gave. All of those factors together should have sent this to a jury. We're not here to decide whether Ms. Taboron was discriminated against. That's not the province of this court. It's to determine whether she elicited sufficient evidence to go to a jury. If the court wants to lift the page limits and the submission limits, we could submit millions of things in cases. Well, we're not going to do that. Don't worry. That's not going to happen here. I don't think it's going to go down. Can I just get a quick clarification on the point I asked your opponent, which is the statement that there was an observation of coldness towards one employee versus another. Is that a gloss on what's in the affidavit? No, she gave testimony to it. And then I believe it may have been in the affidavit in support of summary judgment and not the ROI affidavit from the EEO investigation. I was trying to find it, but I didn't have sufficient time. She didn't say that she was cold. She just said that when she came in in the morning, she didn't speak to me or other African Americans when she did so for white individuals. I think it's evidence that supports the idea that she didn't want to work with African Americans. She had issues with African Americans.  Thank you, Your Honor. Thank you.
judges: Tatel, Srinivasan, Silberman